**Office of Disciplinary Counsel v. Durney**

Disciplinary Board Docket no. 55 D.B. 2003.

BROWN, *Member,* July 30, 2004—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

On April 28, 2003, Office of Disciplinary Counsel filed a petition for discipline against respondent, Joseph James Durney Jr. The petition charged respondent with violations of the Rules of Professional Conduct based on allegations that he converted client funds from an estate checking account on six occasions. Respondent filed an answer to petition on May 30, 2003.

A disciplinary hearing was held on October 27, 2003, before Hearing Committee 3.04 comprised of Chair Donald H. Brobst, Esquire, and Members David E. Hershey, Esquire, and Jack M. Stover, Esquire. Respondent was represented by Clyde W. Vedder Jr., Esquire. Respondent stipulated to the facts of the matter as contained in the petition for discipline. Respondent testified on his own behalf and presented the testimony of an ex-

pert witness as well as three character witnesses. Petitioner presented the testimony of one expert witness.

Following the submission of briefs by the parties, the Hearing Committee filed a report on March 17, 2004, finding that respondent violated the Rules of Professional Conduct as charged in the petition for discipline, and recommending that he be suspended for one year followed by probation with a practice monitor for one year.

Respondent filed a brief on exceptions on April 6, 2004, and requested oral argument.

Petitioner filed a brief opposing exceptions on April 26, 2004.

Oral argument was held on May 10, 2004, before a three-member panel of the Disciplinary Board chaired by Laurence H. Brown, Esquire, with Members Smith Barton Gephart, Esquire, and C. Eugene McLauglin.

This matter was adjudicated by the Disciplinary Board at the meeting of May 18, 2004.

## II. FINDINGS OF FACT

The board makes the following findings of fact:

(1) Petitioner, whose principal office is located at Suite 1400, 200 North Third Street, Harrisburg, PA 17101, is invested, under Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and duty to investigate all matters involving professional misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent, Joseph James Durney Jr., was born in 1955 and was admitted to practice law in this Common-

wealth in 1980. His registered address is P.O. Box 164, 15 North Cherry Lane, York, PA 17405. He is subject to the disciplinary jurisdiction of the Disciplinary Board of the Supreme Court of Pennsylvania.

(3) Respondent has no prior record of discipline.

(4) In January 1997, respondent became employed as an associate attorney for the York law firm of Andrew Kagen.

(5) Renee S. Gatling of York County, Pennsylvania, died on April 5, 1997. As an employee of the Kagen firm, respondent undertook the representation of Gwendolyn Smith of Norfolk, Virginia, the mother of Renee Gatling. On April 21, 1997, respondent caused letters of administration to be issued to Ms. Smith in York County for the Renee S. Gatling estate.

(6) On April 21, 1997, respondent took Ms. Smith to Mellon Bank in York and opened checking account no. ******* as an estate account for the Gatling estate. Ms. Smith was the sole signatory on this account.

(7) At respondent's request, Ms. Smith signed some blank checks on the estate account to facilitate the administration of the Gatling estate.

(8) Respondent prepared estate account check no. 1040, dated July 24, 1998, in the amount of $700, and payable to respondent.

(9) Estate account check no. 1040 bore the signature of Ms. Smith but was drawn by respondent without her knowledge or permission.

(10) On or about July 24, 1998, respondent negotiated estate account check no. 1040.

(11) Respondent personally utilized the entire $700 proceeds from estate account check no. 1040.

(12) Respondent's use of the proceeds was without the knowledge or permission of Ms. Smith.

(13) Respondent used the $700 in partial payment of a $1,000 car repair bill that had been anticipated to be about $300.

(14) Respondent prepared estate account check no. 1041, dated September 25, 1998, in the amount of $500, and payable to respondent.

(15) Estate account check no. 1041 bore the signature of Ms. Smith but was drawn by respondent without her permission or knowledge.

(16) On or about September 25, 1998, respondent negotiated estate account check no. 1041.

(17) Respondent's use of the $500 proceeds was without the knowledge or permission of Ms. Smith.

(18) Respondent does not recall how he utilized the $500 proceeds, or the proceeds of any of the checks he wrote subsequent to the first check for $700.

(19) Respondent prepared estate account check no. 1042 dated October 26, 1998, in the amount of $250, and payable to respondent.

(20) Estate account check no. 1042 bore the signature of Ms. Smith but was drawn by respondent without her knowledge or permission.

(21) On or about October 26, 1998, respondent negotiated estate account check no. 1042.

(22) Respondent personally utilized the entire $250 proceeds of estate account check no. 1042, without permission by, or knowledge of, Ms. Smith.

(23) Respondent prepared estate account check no. 1043, dated January 23, 1999, in the amount of $350, and payable to respondent.

(24) Estate account check no. 1043 bore the signature of Ms. Smith but was drawn by respondent without her knowledge or permission.

(25) On or about January 23, 1999, respondent negotiated estate account check no. 1043.

(26) Respondent personally utilized the entire $350 proceeds of the estate account check no. 1043 without the knowledge or permission of Ms. Smith.

(27) Respondent prepared estate account check no. 1050, dated February 15, 1999, in the amount of $25, and payable to respondent.

(28) Estate account check no. 1050 bore the signature of Ms. Smith but was drawn by respondent without her knowledge or permission.

(29) On or about February 15, 1999, respondent negotiated estate account check no. 1050.

(30) Respondent personally utilized the entire $25 of estate account check no. 1050 without knowledge or permission of Ms. Smith.

(31) Respondent prepared estate account check no. 1044, dated February 16, 1999, in the amount of $50, and payable to respondent.

(32) Estate account check no. 1044 bore the signature of Ms. Smith but was drawn by respondent without her knowledge or permission.

(33) On or about February 16, 1999, respondent negotiated estate account check no. 1044 for cash.

(34) Respondent personally utilized the entire $50 proceeds of estate account check no. 1044 without the knowledge or permission of Ms. Smith.

(35) When respondent wrote the Gatling estate checks to himself and utilized the proceeds he knew that he had no entitlement to those funds.

(36) On each of the six occasions when respondent wrote checks to himself on the Gatling estate account, he had a need for funds, knowingly retrieved the Gatling estate checkbook, wrote a check to himself, cashed that check and used the proceeds.

(37) Respondent never wrote a check against any other estate account.

(38) Respondent was aware that he owed restitution to the Gatling estate, but he did not take any action in that regard because he claimed he did not have access to funds, as his wife was in charge of the family finances.

(39) Beginning around 1998, respondent began experiencing financial difficulties as the Kagen firm reduced his salary by 20 percent, and in June 1998, his wife lost her job.

(40) At that time respondent also had an IRS debt of $20,000 and credit card debt of approximately $15,000.

(41) Respondent's wife handled all of the household finances and by the couple's agreement respondent received a weekly allowance.

(42) Respondent's employment with the Kagen firm ended in July 2000.

(43) Prior to leaving the Kagen firm, respondent reviewed his case files with the firm, including the Gatling estate.

(44) When the Gatling estate file was reviewed by the Kagen firm, respondent was aware that he had improperly taken $1,875 but he did not disclose this fact.

(45) The Kagen firm audited their records for the Gatling estate and, in or about December 2000, the firm obtained copies of the six estate account checks payable to respondent and totaling $1,875 and determined that those funds did not represent fees or costs due to the firm.

(46) By letter of December 15, 2000, to respondent, the Kagen firm demanded that he provide an accounting and an explanation for the six estate account checks.

(47) In January 2001, respondent, through counsel, returned $1,875 to the Kagen firm.

(48) On the advice of his wife, respondent contacted George DeSau, a psychologist, in August 2000 for the purpose of exploring perceived difficulties and failings in his professional life. Respondent did not mention to Dr. DeSau his misuse of the estate funds until after the Kagen firm demanded return of the funds.

(49) Respondent subsequently contacted Ellis Berkowitz, a licensed social worker, in April 2001 and began counseling with him on a weekly basis.

(50) Respondent indicated to Mr. Berkowitz at their first meeting that he had been contacted by Office of Disciplinary Counsel relative to misused funds.

(51) Respondent admitted to Mr. Berkowitz that he personally used the funds of the Gatling estate with the intent of paying them back.

(52) On each occasion of his misuse of funds, respondent was short of funds, feared recriminations from his wife, and so panicked and used the estate funds.

(53) Mr. Berkowitz diagnosed respondent with Attention Deficit Hyperactivity Disorder (ADHD) with some

evidence of dysthymia, which is a low-level depression where a person will have ongoing symptoms of depression for six months or longer.

(54) Respondent was initially placed on Adderal for his ADHD. Adderal influences the brain chemistry and decreases the symptoms of ADHD, causing a person to be less distracted, impulsive, inattentive and reckless.

(55) Mr. Berkowitz stated that a characteristic of respondent that indicated ADHD was his trouble thinking clearly and using sound judgment, especially under stressful conditions. Respondent's ADHD negatively impacted his ability to control his impulsive actions.

(56) Mr. Berkowitz opined that a causal connection existed between respondent's misconduct and his ADHD.

(57) Mr. Berkowitz believed that at the times of the misuse of the funds respondent reacted inappropriately due to financial pressures.

(58) Mr. Berkowitz could not explain why respondent's ADHD impacted his behavior in the Gatling estate, and no other case that he was working on.

(59) Respondent's ADHD did not adversely impact his ability to understand right from wrong.

(60) Dr. Vincent Berger, a licensed psychologist, was retained by petitioner to evaluate respondent and comment on Mr. Berkowitz' conclusions.

(61) Dr. Berger did not dispute Mr. Berkowitz' ADHD diagnosis, but opined that there was no causal relationship between respondent's ADHD and the misconduct.

(62) At the time of the misconduct, respondent was facing various stressors in his life, among them his mother's terminal illness, his chronic degenerative disc

disease, financial pressures from his wife, and his parent's decision to seek other legal counsel relative to their estate planning.

(63) During this time respondent was consuming large amounts of alcohol on a daily basis.

(64) Respondent testified on his own behalf.

(65) Respondent testified that he panicked under ongoing pressure from the various factors in his life and misappropriated the estate funds.

(66) Respondent admits he did not always respond to a pressure situation in the way that he should have.

(67) Three character witnesses testified on behalf of respondent.

(68) Robert Bowen is a financial advisor who has known respondent for many years. He believes respondent has good moral character and this opinion is shared by the community.

(69) George Kain III, is an attorney who practices in York. Mr. Kain believes respondent enjoyed a good reputation for honesty in the community, but acknowledged that at least some in the community would feel that respondent engaged in inappropriate conduct relative to his use of the Gatling funds.

(70) Susan Baugh is the executive director of Atkins House, a half-way house for women in York. She believes respondent has a good reputation in the community for having a high moral caliber. She also believes the misconduct was out of character for respondent, but it did not change her initial opinion of him.

(71) Respondent expressed sincere remorse for his actions and fully admitted his wrongdoing.

(72) Respondent cooperated with Office of Disciplinary Counsel.

(73) Respondent has been very active in the York legal community. He served on the York County Estate Planning Council and the Orphans' Court Rules Committee.

(74) Respondent has been active in civic matters in the York community. He has served Atkins House both as president and a member of the board of directors. He has been on the policy committee of the Jewish Community Center since 2002. He served as president and a board member of the Kiwanis Club and was a graduate of the Leadership York Class of 2002. He is currently a board member of the Multiple Sclerosis Society.

(75) Since July 2000, respondent has conducted himself as a sole practitioner.

## III. CONCLUSIONS OF LAW

By his conduct as set forth above, respondent violated the following Rules of Professional Conduct:

(1) R.P.C. 1.15(a)—A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with the representation separate from the lawyer's own property.

(2) R.P.C. 8.4(c)—It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

## IV. DISCUSSION

This matter is before the Disciplinary Board on a petition for discipline charging respondent with violations

of the Rules of Professional Conduct based on his mishandling of estate monies. Respondent stipulated to the facts of the matter as contained in the petition for discipline and admitted that he violated Rules 1.15(a) and 8.4(c) of the Rules of Professional Conduct.

What remains to be decided by the board is the appropriate sanction to be imposed on respondent in light of his ethical misconduct. This case involves the misappropriation of funds from an estate, a serious act of misconduct. Precedent has established that unauthorized dealings with client money requires some form of public discipline due to the breach of trust involved. *In re Anonymous No. 124 D.B. 97,* 47 D.&C.4th 338 (1998). The appropriateness of a disciplinary sanction is based on the nature and gravity of the misconduct and the aggravating and mitigating factors present. *In re Anonymous No. 85 D.B. 97,* 44 D.&C.4th 299 (1999).

Respondent does not contest the six separate acts of misconduct nor the rule violations. Respondent, relying on *Office of Disciplinary Counsel v. Braun,* 520 Pa. 157, 553 A.2d 894 (1989), argues that his conduct was substantially the consequence of his psychiatric disorder, thus entitling him to mitigation of the discipline to be imposed.

Respondent presented the expert testimony of Ellis Berkowitz, a licensed clinical social worker. Mr. Berkowitz diagnosed respondent with Attention Deficit Hyperactivity Disorder. Some of the hallmarks of this disorder are difficulty thinking clearly and using sound judgment, especially under stressful conditions. Mr. Berkowitz described respondent in the low to moderate range of symptoms for ADHD. Mr. Berkowitz opined

that the ADHD was a substantial causal factor in respondent's misconduct.

Petitioner presented the testimony of Dr. Vincent Berger, a licensed psychologist. Dr. Berger did not find fault with Mr. Berkowitz' diagnosis of ADHD, but did dispute the opinion that it caused respondent's misconduct. Dr. Berger opined that while ADHD contributed to respondent's method of handling his law practice and his personal life, it did not substantially cause the theft of the funds. Respondent experienced stress from a variety of situations in his life at the time of the misconduct. ADHD was merely one of the ongoing factors in his life.

Respondent's own testimony is informative. He understood each time he took funds from the Gatling estate that it was wrong to do so. Respondent indicated that his continued use of the Gatling estate funds involved bad decisions and irrational decisions that he made when he panicked under pressure. Respondent pinpointed the source of the pressure as financial difficulties he and his wife were experiencing and his inability to be truthful with her as to his monetary needs because he feared her bad temper. He believed he could not ask her for money. Respondent related that each misappropriation was due to a financial crisis. The evidence of record in its totality does not clearly and convincingly support a conclusion that respondent's ADHD caused him to misappropriate estate funds. For this reason the board concludes that respondent did not meet his burden pursuant to *Office of Disciplinary Counsel v. Braun.*

While the board does not find mitigation pursuant to *Braun,* other mitigating factors are present in this particular matter. Respondent showed remorse for his actions and was forthright and cooperative with Office of

Disciplinary Counsel. He has taken action to address his ADHD, attending counseling sessions and taking medication. Respondent has cut back on the amount of alcohol he drinks in his continuing efforts to make positive changes in his lifestyle. Respondent has no prior discipline of record and has had no complaints filed against him since the misconduct, which occurred in 1998-1999. Respondent made restitution to the Gatling estate. Although respondent had access to other estate accounts, he never wrote checks against them or otherwise acted inappropriately. Review of respondent's files by the Kagen firm revealed no improprieties other than the Gatling estate. Respondent's three character witnesses spoke highly of his good reputation in the community. Respondent has remained active in legal and philanthropic endeavors in his community. Respondent is willing to have a practice monitor oversee his case files and make certain he is handling his practice in an appropriate manner.

A careful review of the case law in Pennsylvania reveals that the Supreme Court has imposed a wide range of suspension on attorneys who have converted money from a client or law firm. The length of the suspension is predicated on the specific facts underlying the conversion. The number of conversions, the length of time involved, and the attorney's attempts to make restitution are pertinent factors. *In the Matter of In re Anonymous No. 32 D.B. 89,* 13 D.&C.4th 478 (1992), a three-year suspension was imposed on a lawyer who misappropriated approximately $7,500 in fees over a period of three and a half years. In the case of *In re Anonymous No. 8 D.B. 97,* no. 402 disciplinary docket no. 3 (Pa. April 20, 1998), the attorney was suspended for one year and one

day after he diverted an unspecified amount of fees to himself from his law firm over a 13-month period of time. In the case of *In re Anonymous No. 123 D.B. 90*, 17 D.&C.4th 464 (1992), a lawyer who misappropriated estate funds in the amount of $2,300 and had a prior record of discipline was suspended for one year and one day. In the recent matter of *In re Muir*, no. 79 D.B. 2002, no. 891 disciplinary docket no. 3 (Pa. March 1, 2004), the attorney was suspended for three months after she converted a single $500 fee that was payable to her law firm, and further failed to timely pay fees over to her law firm in three other matters. This attorney was aware of the wrongfulness of her actions, yet did not remedy her carelessness with the funds of others until questioned by her law firm more than one year later.

After review of the nature of the misconduct and the mitigating factors in the context of the case law, the board is persuaded that a suspension of six months is appropriate, followed by probation and a practice monitor for one year.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania recommends that the respondent, Joseph James Durney Jr., be suspended from the practice of law for a period of six months followed by probation for a period of one year, subject to the following conditions:

(1) Respondent shall select a financial and practice monitor subject to the approval of the Office of Disciplinary Counsel.

(2) The financial and practice monitor shall do the following during the period of respondent's probation:

(a) Meet with respondent on a monthly basis to review respondent's caseload and trust account to ensure continued compliance with proper handling of funds and maintenance of appropriate records;

(b) File quarterly written reports on a board-approved form with the executive director and secretary; and

(c) Shall immediately report to the executive director and secretary of the board any violation of the respondent of the terms and conditions of probation.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.

Board Members Saidis, Newman, Pietragallo and Nordenberg dissented and would recommend a one-year suspension followed by one year of probation.

Board Chair Teti recused himself.

Board Vice-Chair Rudnitsky did not participate in the May 18, 2004 adjudication.

## ORDER

And now, October 15, 2004, upon consideration of the report and recommendations of the Disciplinary Board dated July 30, 2004, it is hereby ordered that Joseph James Durney Jr. be and he is suspended from the practice of law in the Commonwealth of Pennsylvania for a period of one year, followed by probation for a period of one year, subject to the following conditions:

(1) Respondent shall select a financial and practice monitor subject to the approval of the Office of Disciplinary Counsel.

(2) The financial and practice monitor shall do the following during the period of respondent's probation:

(a) Meet with respondent on a monthly basis to review respondent's caseload and trust account to ensure continued compliance with proper handling of funds and maintenance of appropriate records;

(b) File quarterly written reports on a board-approved form with the executive director and secretary; and

(c) Immediately report to the executive director and secretary of the board any violation of the respondent of the terms and conditions of probation.

It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.